## WHEELING.

PFEISTER v. THE WHEELING BUILDING ASSOCIATION *et als.*

Submitted June 18, 1878.    Decided May 6, 1882.

1. Homestead and building associations in this State are incorporated under the 54th chapter of our Code, page 411. The 25th section of this chapter provides. "Homestead and building associations formed under this chapter may be for the purpose of raising money to be used among the members of such corporation in buying lots or houses, or in building or repairing houses;" The 20th section provides : " Such corporations shall not use or direct the funds thereof for or to any other object or purpose than those mentioned in the preceding section; and in case said funds shall not be so used or directed, the association so using or directing them shall forfeit all its rights and privileges as a corporation;" and the 27th section provides: " Every such corporation is authorized to levy, assess and collect from its members such sums of money by stated dues, fines, interest on loans advanced, and premiums bid by members for the right of precedence in taking loans, as the corporation by its laws shall provide ; also to acquire, hold, convey, and encumber all such real estate and personal property, as may be legitimately pledged to it on such loans or transferred to it in the due course of lawful business ; provided that the dues, fines, and premiums paid by the members of such corporation, although paid in addition to the legal rate of interest on loans taken by them, shall not be construed to make the loans so taken usurious, HELD :

    I. By virtue of these sections it is the duty of a building association in this State to see, that money paid to its members on loans advanced under the provisions of the 27th section is used by the member to buy lots or houses or to build or repair houses.

    II. When in redeeming shares a building association advances money to

a member, who has bid the highest premium for the precedence in taking the money, such advance of money is a loan, and as such it is under the operation of the statute against usury, except so far as it is protected against the operation of the usury-law by the proviso in the 27th section.   (p. 698.)

III. When a building association fails to perform its duty in seeing, that the money so loaned by it is applied by the member to the purposes specified in the 25th section, it thereby forfeits the privilege conferred on it by the proviso in the 27th section of being exempted from the operation of the usury-law in receiving premiums on money so loaned and used for illegitimate purposes.

IV. But in such a case the corporation has a right to enforce the payment of the principal of the money actually advanced to the member redeeming his share with legal interest thereon at the rate of six per cent. per annum, but has no right to collect compound interest on the money so actually advanced, though this be stipulated in the contract.  Nor has it the right to enforce the payment of the premium bid, such premium being regarded as usurious interest in such a case.   But it has in such case a right to enforce the collection of such reasonable fines, as it may have imposed on the member for the non-payment promptly of dues.

V. In any case a building association, that loans money to a member, has a right to take a deed of trust on the real estate of a third party to secure the payment of the money loaned and the interest thereon and all fines and other charges, with which the member may be legally assessed by reason of his ownership of the shares redeemed and the repayment of all sums, which the association may have to pay for taxes or insurance on the property conveyed by the deed of trust, and also to secure the premium bid by the member for the preference in taking such loan, provided the association has not forfeited its right to take or demand such premium by neglecting to see, that the money loaned was applied to the purposes named in the 25th section.

VI. In such cases the building association is under no obligation to notify such third persons of the failure of the member, who has borrowed the money, to pay his interest, fines or dues promptly.   Such third person must protect his own interest by making enquiries as to whether the member is fulfilling his obligations to the association.

Appeal from and *supersedeas* to a decree of the circuit court of the county of Brooke, rendered on the 14th day of March, 1877, in a cause in said court then pending, wherein John Pfeister was plaintiff, and The Wheeling Building Association and others were defendants, allowed upon the petition of said Pfeister.

Hon. Thayer Melvin, judge of the first judicial circuit, rendered the decree appealed from.

GREEN, JUDGE, furnishes the following statement of the case :

Franciska Conrad was a member of the Wheeling Building Association, a corporation organized under the laws of West Virginia in December, 1867, its principal office or place of business being at Wheeling. The par value of its shares was $150.00. She paid her dues, twenty-five cents per week on each share, from the organization of the corporation to April 7, 1868. She owned four shares of the stock. On April 10, 1868, she redeemed her shares (as the phrase is) at a premium of thirty-one per cent., but more properly speaking, at a discount of thirty-one per cent. on the par value of her shares, and offered as security for what was really the loan made to her a note executed by her, dated April 7, 1868, for $600.00, payable eight years after date with interest from date payable monthly in advance, and a deed of trust of same date on certain real estate in the county of Brooke, executed by her brother, John Pfeister, in which deed of trust the note is correctly described, except that it is said to be payable to said corporation *according to the rules and regulations of the association.* But the identity of this note with that intended to be secured by this deed of trust is shown by a memorandum on the note. The deed of trust given to secure this note was executed by John Pfeister, and the note was endorsed by him. The actual amount of money loaned to Franciska Conrad was $414.00, out of which she paid the expenses of making the deed of trust $11.00 and $3.00, a month's interest on her $600.00 note in advance, as required by the rules of the building association. The deed of trust was duly recorded. It simply provided for the security of this note and further to secure the payment of all taxes and insurance-premiums, which the association might have to pay on account of the neglect of the grantor in the deed of trust, John Pfeister, to pay the same. After July 26, 1869, Franciska Conrad failed to pay anything to the building association, either the interest on her note, the weekly dues or fines; and she had not paid the interest for sixty-three and one half months. So that on August 24, 1874, when the building association expired, she owed to it according to their views and claims $584.60, as follows :

To weekly dues on four shares for 265 weeks, from July 26, 1869, to
  to August 24, 1874 @ $1.00 per week......................................... $265 00
Sixty-three and one half month's interest for her note..................   190 00
Fines for 263 weeks on four shares @ 10 cents per share on each
  week.....................................................................................   105 20
Fines for default in paying interest @ 10 cents per share each
  month....................................................................................    24 40
                                                                          ───────
                                          о                              $584 60

On April 9, 1875, the trustee in this deed of trust J. S.
Stroehlien, advertised the property for sale pursuant to the
provisions in the deed of trust to pay the debts secured by it.
To prevent this sale John Pfeister obtained from the judge of
the circuit court of Brooke county an injunction.    In his bill
he states, that he executed this deed of trust, a copy of which
is filed with the bill, but insists that the note described in it
was not the note really signed by his sister, Franciska Con-
rad, the note she signed being a simple note, and did not
state, that it was payable to the association according to the
rules and regulations of the association.    He states the trans-
action substantially as above stated, says he was not a mem-
ber of the Wheeling Building Association, and says, that the
money loaned to Franciska Conrad was not used in buying
lots or houses or in building or repairing houses, but in vio-
lation of law it was all invested and used in the purchase of
household goods and wares, by reason whereof said associa-
tion forfeited all its rights and privileges as a corporation. .
He claims, that said note was given for the payment of inter-
est at a greater rate than is allowed by law, and that the as-
sociation has received from Franciska Conrad large sums of
money, which should be credited on the note, and that it should
be credited also with such earnings or dividends as were justly
due to her as a member of the association.    He claims, that he
was never notified of her defaults; that the association used no
diligence to recover these payments from her; and that he was
induced to endorse the note by agents of the association
falsely representing what were the earnings and dividends of
the association; and that under the law the association had
no right to take security of a third person for the perform-
ance of the contracts of its own members; that the associa-
tion demanded of him the payment of the $584.60 as above
stated to be due them.    He asks a decree discharging him

from all liability and declaring the deed of trust null and void, and an order enjoining the trustee from selling under the deed of trust, and an order enjoining the association from negotiating or collecting said note endorsed by him, and for general relief.    The bill was sworn to and the injunction awarded as prayed for on April 9, 1875.

The bill was demurred to and an answer also filed by the Wheeling Building Association.    It says, that the association does not nor did it ever know, what Franciska Conrad did with the money loaned her but supposes, it was used by her in buying a house and lot for herself.    But it claims, that it is not bound to see, that persons borrowing money from it shall use the same in any particular or specific manner, or that it has acted contrary to law or forfeited its charter, or that the money was loaned to Franciska Conrad at a greater rate of interest than is allowed by law.    The answer further claims, that the association had given her all the credit she was entitled to ; that it used all proper diligence to obtain from her the weekly dues, fines and interest ; that it had a right to take from John Pfeister the deed of trust; that no false representations were made to him by its agents ; that there is due to it the sum of $584.60, as above stated ; that the note was signed and the deed of trust was given with the distinct understanding and agreement, that it was to be paid according to the constitution and by-laws of the association ; that the note named in the deed of trust was the same one executed by Franciska Conrad, she never having given any other note. The answer admits the other statements in the bill and asks, that the injunction be dissolved ; that the cause be referred to a special commissioner to ascertain the indebtedness of Franciska Conrad to the association, which is secured by the deed of trust ; and that the property conveyed by it be sold and the debt paid; and that it be thence then dismissed with its costs.

There was filed with this answer a copy of the constitution and by-laws.    This answer was sworn to by J. L. Stroehlien, the secretary of the association, and his deposition and that of B. Kammer, a former secretary and solicitor of the association, were taken, prove the facts above stated in the statement of the case and the facts stated in the answer in denial of them in the bill.

The evidence of the officers of the association was taken, which proves the statement in the answer. They testify to nothing, which could have induced the association to suppose, that the money lent by it to Franciska Conrad or any part of it was invested in any house or lot. They do not testify, that she ever bought any house or lot, or ever owned any. So that the statement in the answer of the association, that it supposed, that the money loaned was invested in a house and lot for her use, is entirely unsustained.

On December 25, 1875, the court by the consent of parties, ordered William P. Hubbard, a special commissioner, to ascertain and report, first, whether the note given by Franciska Conrad was secured in the deed of trust, and secondly, the amount, if any, which is due to said association from her and secured by the deed of trust. On March 17, 1876, he made his report. No new evidence was taken before him. He reported, that the note named in the bill as the only one ever given by Franciska Conrad was the one secured by the deed of trust; and that the amount due from her and secured by the deed of trust was $455.00 with interest from August 24, 1874, it being composed of the dues and interest owing and and unpaid by her up to that date; and that this amount was secured by the deed of trust executed by John Pfeister though not a personal debt due from him; and that the fines claimed by the association amounting to $129.60, although due from her, were not secured by the deed of trust. He was of opinion, that the building association had not forfeited its charter, and that there was no usury in the loan made by them to Franciska Conrad, it being authorized by law; and he was further of opinion, that the amount actually revceived by her, $414.00 with interest at the rate of six per cent. per annum compounded monthly, as was the contract under the constitution of the association, after allowing all credits for money paid, which would aggregate $116.00, would amount to more than $455.00, before mentioned as the amount found to be secured by the deed of trust. So that usury could not be complained of, even if there was no such statutory provision, that the dues, fines and premiums paid by the members of a building association should not be construed to make the loan usurious.

This report was excepted to by the plaintiff's counsel, because—first, it found the note named in the bill was secured by the deed of trust; second, because it finds, the sum of $455.00 due to the association by Franciska Conrad is secured by the deed of trust; third, because it finds that the forfeiture of the charter can not be relied on in this suit, and that it is not proven ; and fourth, because it finds, that the loan secured by the deed of trust was not usurious as to the plaintiff Pfeister. On March 14th, 1877, the court overruled all these exceptions and confirmed the commissioner's report, and found that there was due from the plaintiff to the Wheeling Building Association $455.00, with interest from August 24, 1874, till paid secured by the deed of trust, instead of $584.00 claimed by the Association ; and it ordered that unless this $455.00 and interest was paid in thirty days, the property named in the deed of trust should be sold by R. G. Barr, appointed a special commissioner for that purpose on the terms, &c., and in the manner specified ; and the special commissioner before proceeding to execute this order was required to give bond conditioned according to law, in the penalty of $1,000. An appeal and supersedeas was granted the plaintiff to this decree.

The following is such portion of the constitution and by-laws of the Wheeling Building Association, as is necessary to fully understand the case :

"ARTICLE 1.

"This association shall be called the 'Wheeling Building Association ;' its object shall be the accumulation of a capital, by paying in weekly savings, by which the members shall be enabled to build or purchase houses.

"ARTICLE 9.

"Every member has to pay for each share twenty-five cents entrance fee and twenty-five cents weekly dues in current money.

"ARTICLE 10.

" Sec. 1. Every share is entitled to a redemption of $150.00.

" Sec. 3. It is the duty of any one who receives redemption money to pay 6 per cent. interest on the full amount per share, monthly in advance, until the association shall be dissolved.

"Sec. 7. Any member, who is to receive money, shall secure

the association with lien on buildings, real estate, or free shares of the association—said security must be agreeable to the directory.

" Sec. 8. Fire insurance policies on the property have to be assigned to the association and the receiver has to pay all costs.

" Sec. 13. Any member, who has drawn money on taxable property, shall be bound to pay said taxes (city, State or others) in such a time as the association may designate, or will be fined five dollars.

" Article 14.

" *Fines.*

" Members, who fail to pay their weekly dues at least every second week, shall be fined 10 cents per week for every share ; for due interests the same in proportion. And when the fines equal the money paid in, such share shall be forfeited the holder for the benefit of the association.

"Article 16.

"*Fines for Members.*

" Every shareholder who is not present at the yearly meeting on the fourth Thursday in the month of December shall be fined 50 cents : duly written excuses on account of sickness, or absence from town, will be accepted in such a case.

" Article 17.

" *Association Dissolved.*

" When every member shall have had awarded to him the redemption amount of $150.00, as per article 10, then this association shall be dissolved."

*G. W. Caldwell for appellant* cited the following authorities : Angel & Ames Corp. § 111 ; *Id.* §§ 259, 260, 265 ; Code ch. 54 § 26 ; *Id.* § 27 ; 1 Rand. 76.

*R. G. Barr for appellees* cited the following authorities ; 5 Leigh 109 ; 7 W. Va. 152 ; 7 Gratt. 352 ; 5 Duer. 676 ; 4 Thomp. (N. Y.) 690 ; 26 N. J. Eq. 351 ; 25 Ohio St. 186 ; 3 Gratt. 142 ; 2 Lom. 191 ; 16 Me. 224 ; 24 Md. 563 ; 35 N. J. 285 ; 33 N. Y. 665 ; 19 Kan. 321 ; 84 Pa. St. 211 ; 29 Ohio St. 92 ; *Id.* 252 ; 45 Md. 541 ; 25 Ohio 208 ; 38 Md. 115.

GREEN, JUDGE, announced the opinion of the Court :

Before the passage of any act for the incorporation of building and homestead associations they could be formed and were formed as voluntary associations of parties desiring by concerted action to raise money by small payments and accumulate it till such time, as enough had been accumulated to enable each member to build himself a dwelling-house and thus acquire a home.

The first thing, which would occur to those engaged in such enterprise, would be, that each member should at stated short intervals, say of a week or month, pay into the common treasury a small fixed sum, which they would call *dues ;* and the payment of this sum would be continued till such time, as each member upon a division of the funds among them would have accumulated a sum sufficient to purchase or build him a dwelling-house.

The next thing, which would occur to the members of such a voluntary association, would be, that the funds, which they had on hand, should be loaned out at legal interest, and the borrowers should be required to pay the interest on the loans at short intervals, so that such interest paid might be added to the dues paid in by members and be lent out at short intervals in like manner to others, and thus the fund be accumulated as rapidly as possible. And in fixing the time, when the principal of such loans should be paid, the association would naturally fix it at a period, when in their judgment the association would have accumulated sufficient funds to enable each member to buy for himself or build a dwelling-house, that is, that they would fix the time, when the notes given for these loans should be payable, at the time, when they thought the association would terminate and be dissolved.

The next thing, which would naturally occur to the members of such an association, would be, that they would further promote the objects of the association by confining their loans to the members of the association on their giving to the association good security ; and they would, in order to do equal justice to each member, lend to any one member the amount only, which they had fixed upon as the amount,

which should be coming to each member at the dissolution of the association and the division among them of the accumulated fund. They would naturally as a general rule take from each member so borrowing their funds security for its payment in the shape of a deed of trust or lien on the lot on which he proposed to build his house. This would generally be ample security as it would carry with it a lien on the house, and as the real debt would in effect at least, if not in name, be reduced each week or month by the payment of his dues, and as he would under the provisions of the deed of trust be compelled to pay the interest on the money loaned him at short intervals, the note debt would be constantly and regularly reduced, so that what might at first have been not very ample security, would in a reasonable time become complete security for the debt. If the member borrowing, however offered to give a lien for its security on other property real or personal, there would be no reason, why it should not be accepted. And if the association chose, which they would not be apt to do, they might take simply personal security for the loan ; but this would not be likely to be offered, as the members of such a voluntary association would be poor men desiring to acquire homes for themselves and would not be men generally able to give good personal security for money borrowed. For if they had sufficient credit to borrow money and give personal security for it, where it was payable at a distant period, they would hardly need to become members of such an association to secure to themselves a home.

This lending of money to its own members only would be found very convenient and obviously promotive of the objects of such an association. It would enable the member borrowing the money to build at once his house instead of waiting till the end of the association to get the funds wherewith to build ; and the association would be saved all trouble in collecting the principal of the money, which might be loaned, because when it should become due, they would owe to the member borrowing a sum just sufficient to pay off his loan ; and it would be agreed, that the one claim should offset the other. But as soon as the association determined to loan its funds only to members, a difficulty would at once arise, as a large number of members might and probably would want to borrow

the fund, which the association at any given time might have on hand to lend. This difficulty might perhaps be met by determining by lot, which of all the members should be entitled to precedence in taking the loan. But this it would be found would not satisfactorily solve this difficulty; for the lot might give a member the precedence, who did not wish then to borrow the money or build at that time; and the members being numerous and but few present, it would generally happen, that this preference by lot would be cast on one, who was not present, and till it was ascertained, that he did not want the money or a loan, it could not be allotted to another; and thus much delay and trouble would be produced.

To avoid this the association might wisely conclude, that it would determine, who among its many members should have the preference in taking the money offered to be loaned, by saying, that the member present, who would agree to make the largest abatement, from the amount to be paid each member at the close of the association, should be entitled to the precedence in taking the loan. And this person as well as the amount, which he was willing thus to abate at the time, when the association should end, from what would then be coming to him, would be ascertained by a public bidding; and when ascertained, in order to make the amount coming to him from the association at the time of its close exactly balance the amount, which would then be due from him, they would loan to him an amount equal to the sum to be paid him at the close of the association, less the amount he had agreed at that time to have abated because of this preference given him. They would take his note payable, when the association would probably close, for the amount loaned, and would require him to pay the interest on this note at short intervals, say every month; and in the deed of trust they would secure not only the payment of the note but also the prompt payment of the interest. Of course they would only charge legal interest on the money actually loaned and advanced to him; and even then he would be receiving less from the association than the other members by the amount of the abatement, which he had agreed should be made from what would be coming to him and every other member at the close of the association. Having no English word to express

accurately this abatement, they might have called it, as they did, " the premium bid for the right of precedence in taking the loan." And there being no appropriate word to represent this transaction, it would naturally come to be called by various names, which with more or less accuracy would in a word or brief phrase give an idea of it. Some might call it " a redemption of his interest in the association," as the ultimate effect of it would be, that he would at the close of the association get no money from it, because what would be otherwise coming to him would be absorbed by the payment of his note and this abatement he had agreed to, or his premium, as it is generally called. Sometimes it would be called for the like reason but with still more inaccuracy " a purchase of all his interest in the association by the association." And as the loan is really to be ultimately paid by off-setting his interest in the association against this note to the association, it would sometimes with much more accuracy be called ."a loan on his interest in the association."

By whatever name the transaction is called, it seemingly would operate harshly on the borrower; but this hardship arising from his agreement to make this abatement or give this premium for this right of precedence in taking the loan is more seeming than real, as all the other members, when they borrow money loaned, (and all must borrow as no stranger is permitted to do so) must also bid a premium for their precedence, and these premiums will probably average as much as his; and if so, no injury would have resulted to him. For these premiums lessening the amount the association will have to pay to each member at its close will of course shorten the time, in which the funds can be accumulated by the association to make these payments to its members, and thus it will be brought to a speedier close, and the time, in which the dues to be paid by each member as well as the time, for which interest will be paid by members on the moneys which they have borrowed, will be shortened; and on an average the amount of these premiums paid by the members will be reimbursed to them by this shortening of the time, for which they have to make these payments of dues and interest. It is true, exact justice would not be done each member, because these premiums bid for the precedence in

taking loans would vary in amount; but it is as near justice to each, as can be reached by this or possibly any other mode of determining this precedence. The payment of these premiums must therefore be regarded as undesirable in itself and as tending in some degree to produce inequality and thus do injustice to some members; but it should be regarded as a necessary evil incident to the giving of precedence to one member over another in taking loans and as unavoidable.

The members of such voluntary association would naturally meet with another difficulty in carrying out their scheme. In order that the enterprise should be a success, it is necessary, that each member should pay up punctually his dues or amounts to be paid at short stated intervals of say a week or a month. If this be not done, it is obvious, that injustice would be done to those, who make the payments of their dues promptly. To avoid this injustice, the society or association would naturally resort to the imposition of fines on those members, who were delinquent in the payment of their dues promptly. These fines would be made reasonable, just sufficient to make it the interest of each member to make a strenuous effort to pay his dues promptly at the required times.

As the different members might desire to build dwellings for themselves differing in style according to their several pecuniary abilities, this want would be naturally met by permitting one member to pay a larger sum for his stated dues than another and at the close of the association receive a larger amount in exact proportion to his larger amount of dues paid. Such voluntary societies however, after all they could do to carry out justly and equally their scheme, would still find serious trouble in their way. The taking of these fines and premiums in addition to legal interest on the money loaned, though necessarily incident to their scheme and designed to wrong no one, might still be regarded as exacting money of those, who borrowed from them, and thus render these transactions illegal. Practically, there being many members in such association, they would find it very inconvenient to thus transact their business as a partnership; and they would therefore naturally desire, that the Legislature would permit them to become a corporation and by law provide, that the "dues, fines and premiums paid by its members, although paid in addition

to the legal rate of interest on loans taken by them should not be construed to make the loans so taken usurious." And desiring to encourage the acquisition of homes by all classes of our citizens our Legislature has met this reasonable wish of persons desiring to form associations of the character above described and has removed the obstacles in their way by permitting such persons to become corporations and by declaring, that the dues, fines and premiums paid by the members of a corporation, whose objects and modes of dealing are of the general character above described, although paid in addition to the legal rates of interest on loans taken by the members, shall not be construed to make the loans so taken usurious. This was, I understand, the exact object and purpose of our Homestead and Building Association law.

Chapter 54 of the Code of West Virginia provides as follows :

" 1. Joint stock companies may be incorporated for establishing homestead and building associations and transacting the business properly pertaining thereto.

" 25. Homestead and building associations formed under this chapter may be for the purpose of raising money to be used among the members of such corporations in buying lots or houses or in building or repairing houses; and shall be subject to the provisions of this and the 53d chapter, so far as the same are not inconsistent with the following sections.

" 26. Such corporations shall not use or direct the funds thereof for or to any other object or purpose than those mentioned in the preceding section ; and in case the said funds shall be so used or directed, the association so using or directing them shall forfeit all the rights and privileges as a corpo-ration.

" 27. Every such corporation is authorized to levy, assess and collect from its members such sums of money by stated dues, fines, interest on loans advanced, and premiums bid by members for the right of precedence in taking loans, as the corporation by its laws shall provide ; also to acquire, hold, convey and encumber all such real estate and personal property, as may be legitimately pledged to it on such loans, or may be otherwise transferred to it in the due course of its lawful business ; *Provided,* That the dues, fines and premiums

paid by the members of such corporation, although paid in addition to the legal rate of interest on loans taken by them, shall not be construed to make the loans so taken usurious.

" 28. All the stockholders of any such corporation shall be held liable to an amount equal to the stock subscribed by them, or held by them at any time, in addition to said stock, for the purpose of securing the creditors of said association.

" 29. Every such corporation shall adopt a constitution, which shall be signed by the members thereof, and which shall embrace all the provisions of the four preceding sections, and such articles for its government and the management of its business as it shall deem proper, provided the same are not inconsistent with the provisions of the four preceding sections."

While this statute and the statute-law of England and other States were beneficial in promoting the objects of incorporated voluntary building associations by removing some of the difficulties and disadvantages, under which they labored, their incorporation was not an unmixed benefit ; for it introduced other and serious evils highly prejudicial to the objects in view. While these societies were unincorporated their members would consist naturally of persons of small means, whose object in uniting with the societies would be to secure homes for themselves by paying at short intervals small sums or dues, which it was in their power to pay. But when these building societies became corporations it would obviously cause to become members of them a large number of persons, who already had homes, and who in taking shares in such corporation would do so, not that they might by borrowing from the association or otherwise get funds, wherewith to build houses for themselves, but that they might make a safe and profitable investment of their spare capital, where it would produce a large interest. If this sort of stockholders held a majority of the stock, as was often the case, so that they could control the organization, it is obvious, that the constitution and by-laws of the corporation would be apt to be framed not so much with a view of promoting the professed objects of such corporations, to enable its members with their aid to procure homes for themselves, as with a view of making the profits of those members, who did not borrow from the association,

as large as possible, and thus bringing the association to a close as soon as possible and dividing among them the assets of the association, giving to each the amount fixed upon as coming to each shareholder when the corporation was formed. These profits were of course made only out of those members, who to secure homes for themselves had borrowed of the corporation, or as the phrase is, redeemed their shares, and out of fines very usually imposed also almost exclusively on this class, for the capitalist was not necessitated to permit himself to be fined for want of promtitude in paying his dues.

Thus the passage of acts of incorporation introduced largely into those societies a new class of members, who have been called accumulators, who never borrowed moneys of the association or redeemed their shares, but who simply met promptly their obligations, and when the association closed received the par value of their stock. Their interest and that of the members who redeemed their shares were obviously diametrically opposed. When the accumulator made a large profit out of his investment, the redeeming members paid larger premiums for their loans and were subjected to many fines. The larger the profits of the accumulators, the harder the terms, on which the association loaned its moneys to the redeeming members. If the accumulators controlled the association, one mode of making their profits large was by inflicting on members, who failed to meet their dues promptly, unreasonable fines, they being of course rarely called on to pay such fines. Another mode was to require the redeeming member to pay interest not on the money actually loaned him and by him received but on the par value of his shares often fully one third more. So that in addition to the premium paid for the right of precedence in taking the loan he also paid often eight per cent. instead of six on the moneys actually loaned to him. Still another mode of making the profits of the accumulators large was to impose often heavy fines on the redeeming member for failure to pay promptly at short intervals the interest on the money loaned him. In many of the building association corporations the combined result of these exactions have been ruinous to many of the redeeming members and the courts, before whom such cases of unjust exactions have come, have condemned them in unmeasured terms.

There are however some compensatory advantages resulting from the encouragement, which the incorporation of building societies gave to accumulators to become members of the association.   As they would not become borrowers of the funds of the association, and as the loaning of its funds was confined to its members, the result of a large number of accumulators becoming members of the association would necessarily be to reduce the competition among the redeeming members for the right of precedence in taking loans, and this would tend to diminish the premiums given for such precedence. But this advantage has in many cases been more than counterbalanced by still a third class being admitted as members, that is, a class who are redeeming members and who become members not to obtain loans for the purpose of building but wherewith to pay pressing debts, to engage in any sort of business or to enter into speculation.   Loans or redemption of shares have been often made by such members not with a view of building but for entirely different uses ; and the money when loaned has been accordingly used for purposes entirely foreign to the objects of such association.   If these loans or redemptions have been made by the association knowing that the funds were to be thus improperly used, it is clear, that the association would subject itself to be proceeded against and have its charter taken away ; for by so doing they would forfeit all their rights and privileges as a corporation. This is expressly declared by the 26th section of chapter 54 of our Code and would without such declaration have been equally true.   But despite this provision and the clear impropriety of making such loans they have very often been made by building associations.   The obvious effect of this is, that the redeeming members, who desire to borrow in order to build, are thereby much injured ; for they are improperly brought into competition with a number of needy persons or speculators, and thus, if they borrow, are compelled to pay much more than is right in the shape of a premium for the precedence of obtaining a loan.

It may be thought, that the views, which I have expressed of the manner, in which unincorporated building societies would proceed, and the supposed advantages and disadvantages of their becoming incorporated societies is ideal, as no

unincorporated societies of this character ever existed, and the effect of their being chartered cannot be determined. It is true, so far as I know, that unincorporated building societies have not existed in this country to any great extent except in Massachusetts and Pennsylvania, because of the facility, with which acts of incorporation of such societies and of companies generally can be procured in this country; but it is far otherwise in England. There these unincorporated building societies existed and flourished for many years, before there was any law proposed which permitted them to become incorporated. Such a building club is mentioned as having existed in Birmingham as early as 1795 ; but nothing is really known about its operations. As early as 1809 one is certainly known to have existed in Greenwich. See Encyclopœdia Brittanica under head of Building Societies. About 1815 the Earl of Selkirk, from purely benevolent motives, started these building societies in Scotland. They were merely private and unincorporated associations and were eminently successful because of the beneficial influence, which they exerted on the industrial classes. See *Bibb County Loan Association* v. *Richards,* 21 Georgia 592. This success of these societies in Scotland gave an impetus to the formation of like societies in England ; and after 1825 they continued to increase and prosper ; and prior to 1834 they had become quite numerous in England.    Their constitutions and mode of doing business were just such, as we have ascribed to voluntary or unincorporated building associations, except that instead of requiring monthly of the redeeming members interest on their loans, they required a small fixed sum called redemption money to be paid by them monthly ; but this redemption money amounted to less in every instance than the interest on the money borrowed. This is not only stated in the article on building societies in the Encyclopœdia Britannica but also it abundantly appears from the constitutions of various of these building societies referred to or copied in English cases decided, shortly after the act was passed permitting their incorporation.

A general act was passed in 1854 known as the Friendly Society's act. Though not expressly included in its language, a number of building associations claimed the benefit of this

act and were certified under it.   In 1836 an act was passed, 6 & 7 Will. IV chapter 32, confirming to these building corporations the privileges of this Friendly Society act and also conferring on them additional privileges ; and thereafter all the building corporations became corporations under this act of 1836.   The important provisions of this act may be found in note to Doe on demise of *Morrison* v. *Glover* 15 Ad. & El. N. S. 103 (69 Eng. Com. Law).   Section 1 of this act after reciting, that "certain societies commonly called building societies have been established in different parts of the kingdom, principally amongst the industrious classes for the purpose of raising by small periodical subscriptions a fund to assist the members thereof in obtaining a small freehold or leasehold property, and it is expedient to afford encouragement and protection to such societies and the property obtained therewith," enacts "that it shall and may be lawful for any number of persons in Great Brittain and Ireland to form themselves into and establish societies for the purpose or raising by the monthly or other subscription of the several members of such societies shares not exceeding the value of £150 for each share, such subscriptions not to exceed in the whole twenty shillings per month for each share, a stock or fund, *for the purpose of enabling each member thereof to receive out of the funds of such society, the amount or value of his or her shares therein, to erect or purchase one or more dwelling-houses or dwelling-house,* or other real or leasehold estate, to be secured by way of mortgage to such society until the amount or value of his or her shares shall have been fully repaid to such society with the interest thereon and all fines and other judgments incurred in respect thereof."   (The balance of this section I deem unnecessary to insert here.)   Section 2 enacts "that it shall and may be lawful to and for any such society to have and receive from any member or members thereof any sum or sums of money by way of bonus on any share or shares for the privilege of receiving the sums in advance prior to the same being realized and also *any* interest for the share or shares so received or any part thereof without being subject or liable on account thereof to any forfeiture or penalties imposed by any act or acts of Parliament relating to usury."

This act remained in force in England till 1874.   In 1846

an important modification of the system of these societies was introduced by invention of what was called the "permanent" plan, which was adopted in England by a great number of the societies organized there after that date.   The statute of 37 and 38 Victoria ch. 38 § 5 defines a "terminating" society as one, "which by its rule is to terminate at a fixed date, or when a result specified in its rules is attained.   This second division of these terminating societies is nothing but a society based on the principles of the old voluntary and unincorporated building society and is the character of the building associations exclusively in use in this State, so far as I know, and most generally in use in the United States.   It is evidently the one especially in the contemplation of our Legislature, when it passed our homestead and building association act above given.   I express no opinion on the question, whether under our act building associations on the "permanent" plan could be organized.   They have to some extent been organized in other States.   The specified result, on which the original voluntary building societies and the building associations in this and a great majority of those in the United States are to terminate is, when every member shall have redeemed his shares, and all the debts of the association are paid, and there are funds enough in the hands of the association to pay every accumulator or person, who has not redeemed his share, a specified sum (the par value of a share) on every unredeemed share.

By the Victoria act a "permanent" society is one, which by its rules does not terminate at any specified time or upon any specified result being attained.   These permanent societies were based on the then obvious fact, that in building associations there were two distinct and separate classes, viz : redeeming members and accumulators.   This distinction of classes was in a large measure produced, as we have seen, by the incorporation of these societies; and by the year 1846 it had become so apparent, that the plans of many of the building associations in England were based on this then recognized fact.   The effect of the English statute of 1836 in introducing into the building associations a new class of stockholders, that is, accumulators, and in promoting exactions, from which they had been practically exempt, was obvious

prior to 1854. Lord Chancellor Cranworth in *Fleming* v. *Self*, 27 Eng. Law & Eq. R. 501-502, decided in 1854 speaking of building associations organized under this act of 1836 says : " In truth the whole scheme is but an elaborate contrivance for enabling persons having sums, for which they have no immediate want, to lend them to others at a very high.rate of interest." The act of 1836, under which these building associations were first organized as corporations, recites, that the members of these organizations then belonged " principally to the industrial classes, and that they were organized for the purpose of raising by small periodical subscriptions a fund to enable the members thereof to obtain a *small* free-hold or lease-hold property, and they ought to be encouraged." Thus it appears, that in 1836 these building associations were composed of poor men seeking to obtain the means of building for themselves dwelling-houses, and that in less than twenty years as a consequence of their incorporation they had become elaborate contrivances, whereby capitalists exacted usurious interest of this poor class of industrious citizens.

I have reviewed the history of building associations and pointed out the tendency to the abuse by such corporations of their chartered privileges and the public evils arising therefrom, that the duty of our Legislature as well as our own duty as a Court might be rendered clear to guard each in its own sphere the true interests of the people of the State against such abuses. I would not have it understood, that building associations in this State are a public evil, so far as I know, and I have had some opportunity of observing. having been the president of such an association for several years. On the contrary I am satisfied, that so far they have very generally been a benefit not only to the communities, in which they were located, but also generally to the members of the association. But I have observed the tendency to the abuse of the corporate franchises of such associations ; and if this tendency is not checked either by additional legislation or by the courts holding the corporations to a strict compliance with not only the letter but the spirit of their charters, there is great dan · ger, that they will here, as they have elsewhere, degenerate into associations organized to exact from the needy usurious

interest, instead of being, what their charters designed, as-
sociations to aid poor men to acquire homes for themselves.
But independent of these special reasons it would be our duty
to so act and to construe strictly the powers conferred on
these corporations ; for this is well established as the rule ap-
plicable to the interpretation of powers conferred on all cor-
porations, as is said in *Beaty* v. *Lessee of Knowler,* 4 Pet.
152–168 : "A corporation is strictly limited to the powers
specially conferred upon it." The same view has been often
taken ; and the courts seem to have been astute in finding
language to enforce an observance of this rule, it being ob-
viously regarded as essential to the preservation of the rights
of the people at large, that all grants of power to a corpora-
tion and all special privileges conferred on it should be
construed with great strictness against the corporation claim-
ing the grant. See *Bradley* v. *N. Y. & N. Haven R. R. Co.,* 21
Conn. 294–306 ; *Pennsylvania R. R. Co.* v. *Canal Com.,* 21
Pa. 9; *Coolidge* v. *Williams,* 4 Mass. 140.

The first enquiry to be made in interpreting our homestead
and building association statute hereinbefore stated at length
is, whether under the true construction of this act the trans-
actions between a member and the building association, when
a share of stock is redeemed by the member, and the associa-
tion pays over to him the difference between the par value of
his stock and the premium bid by him for his precedence in
taking the loan, is to be regarded as really a loan of money
to him or only a purchase by the building association of his
stock, or as money advanced to him out of his interest in the
corporation as one of its stockholders. If it be regarded as a
purchase by the building association of his stock or as an ad-
vance to him out of the funds of the association on account of
his interest as a stockholder, it is claimed, that it cannot be a
loan, and therefore the statute against usury can have no ap-
plication in such a transaction ; and no matter what interest
the association may require him to pay on the money so ad-
vanced, it could not be guilty of usury. To support this po-
sition the counsel for the building association refer to various
authorities and among others to *Silver* v. *Barnes,* 6 Bing. N.
C. 180 ; (37 E. C. L. R. 338); *Burbridge* v. *Cotton,* 8 Eng.
Law & Eq. R. 57 ; *Seagrave* v. *Pope,* 15 Eng. L. & Eq. R.

477; *Merrill* v. *McIntire*, 13 Gray 157; *Shannon* v. *Dunn*, 43 N. H. 194; *McLaughlin* v. *The Citizens Building, Loan and Saving Institution*, 62 Ind. 264; *Wm. H. Holmes and the Monticello Building Association* v. *Smythe*, Supreme Court of Illinois decided Sept. 30, 1881, reported in the Chicago Legal News of Oct. 1, 1881, p. 34.

If however the transaction between a stockholder and the building association, when a share is redeemed, is really a loan, then it is admitted, that the statute against usury would apply to it, unless the special provisions in the homestead and building association statute, which we have stated at length, should in this particular case apply and exempt the building association from the penalties imposed by the usury-statute. If therefore on examination we should find, that this transaction is a loan and not a purchase of stock nor an advance out of the funds of the corporation out of his interest in the corporation, it will be unnecessary to determine, whether the above position taken by counsel with reference to the inapplicability of the statute against usury is or is not correct when the transaction is not a loan. We will therefore first consider, whether this transaction of redeeming a share in a building association is or is not under our statute to be regarded as a loan.

The case of *Silver* v. *Barnes*, 6 Bing. N. C. 180 (37 E. C. L. R. 338) was a case in which the building society was unincorporated, and the redeeming of a share or his interest by a member was regarded by the court as not a loan but a dealing with the partnership funds; and therefore the agreement to pay the premium for the precedence in getting the money was not regarded as making the transaction usurious.

In *Burbridge* v. *Cotton*, 8 Eng. L. & Eq. R. 57, there was a dispute as to whether the building association was incorporated or a partnership. Without deciding this point the court held, that the redemption of a share was an advance of the funds of the association to a member having an interest in the association and not a loan.

In the case of *Seagrave* v. *Pope*, 15 Eng. L. & Eq. R. 477, the building association was regularly incorporated under the act of 1836, 6 & 7 Will. IV. ch. 32, which we have already quoted at length. The Lord Chancellor examined this act in detail and pointed out some blunders in the language

of the act.  He shows, that by the language of the second
section of this act it is provided, "that it shall be lawful for
the societies to receive from their members sums of money by
way of bonus on shares for the privilege of receiving the same
in advance prior to their being realized"; and he therefore
very properly concludes, that under the express wording of
this second section, "the statute contemplated no *loan* or ad-
vance to the member in any other sense than an advance by
way of anticipatory payment of the shares, to which he would
be entitled after having made the stipulated payments."  By
stipulated payments he evidently means the future dues.  I
do not see how under the wording of this section it was pos-
sible to regard, that a building association organized under
that act loaned money to the member redeeming a share.
The association was not authorized to loan money, but only
in the words of the statute to pay it "in advance prior to the
same being realized."  This decision has been very properly
followed by the English decisions ever since.  But the very
ground of this decision would seem clearly to show, that if the
authority conferred on the building association had been not
to "advance money to a member before it was realized" but to
loan him their surplus money, the redemption of a share by a
member would have been regarded as a loan.  Our statute, as
we shall presently see, does authorize a loan and does not au-
thorize "an advance to a member before it is realized."

In the case of *Merrill et als.* v. *McIntire,* 13 Gray 157, like
*Silver* v. *Barnes,* 6 Bing. N. C. 180, (37 Eng. C. L. 338,) the
building association was unincorporated, a partnership, and
the redemption of a share was regarded not as a loan but as an
advance of partnership funds.  This case can aid us but little,
if at all, in reaching a conclusion, as it is obvious, that when
a building association is a corporation, we would be neces-
sarily much influenced by its charter in determining, whether
the redemption of a share was to be regarded as a loan or as
an advance on the anticipated profits of the member.  If the
corporation was authorized as by the English statute to make
an advance of this [character and not authorized to make a
loan, the transaction ought to be interpreted as in England
as such advance and not a loan.  But if the corporation (as we
shall see our corporations of this sort are) was authorized to

make a loan and not such an advance, then the redemption of a share ought to be interpreted as a loan, for the corporation ought to be regarded as doing what it was authorized to do. Precisely the same remarks may be made of the case of *Shannon* v. *Dunn*, 43 N. H. 194, which followed the case of *Silver* v. *Barnes*, 37 Eng. C. L. R. 338. It too was a case, in which the building association was unincorporated and therefore a partnership.

The statute of Indiana passed March 5, 1857, see Gavin & Hord's Statutes of Indiana, vol. 1, p. 275, in the 9th section provides: "A building loan-fund and saving association incorporated under this act in their by-laws may provide for the redemption of the shares of stock by the application of the funds arising out of the dues, fines and assessments of the members at any price, that the company and the member relinquishing his stock may agree upon. The company may also provide, that the members, who may relinquish to the company their stock or any part thereof for a stipulated price, shall give bond and security to the company for the payment to the company on such stock, until such association shall terminate, of all future dues, fines and assessments. Each member of the company shall have an equal opportunity to take such loan; and the member, who shall take the same on the terms most favorable to the company, shall have the preference. The company shall loan no funds except such as arise out of the fees, dues, fines and assessments of its members; and the company shall not loan to any person not being a member." The Constitution of Indiana forbids the enactment of local or special laws on certain subjects, and among them " interest on money." In *McLaughlin* v. *The Citizen's Building, Loan and Savings Institution*, 62 Ind. 264, it was decided, that this act was constitutional, because the bonus, per centage or premium named in this ninth section was merely the contract price, agreed upon between the parties for a "preference," which such association was expressly authorized to sell, and such member authorized to buy, and was not interest on money. The court in their opinion admit, that the redemption of a share by a member under this section was a loan of money and not a purchase of his stock or an advance on his future profits in the company; but they insist, that the pre-

mium was not strictly speaking "interest on money," but a bonus for a preference in taking the loan. And not being strictly speaking " interest on money," this law was not forbidden by the Constitution. They put their decision also on another point, which seems to me much clearer and more tenable than this, that was, "that the act in question was neither local nor special in its provisions within the meaning of those terms used in their Constitution, but was a general law." To sustain this they refer to several authorities.

This decision seems to me adverse to the appellee in this case, the building association ; for the court held the redeeming of a share by a member under the act, which we have quoted, a loan, though they did not consider the bonus strictly speaking "interest on money." But the enquiry before us is whether a redemption of the stock of a member is a loan? There was more reason for interpreting it as a sale of his stock under this 9th section than under our statute-law.

In the case of *Holmes & Monticello Building Association* v. *Smythe* decided by the Illinois Supreme Court September 30, 1881, it was decided, that a redemption of a share of stock of a building association under their law, the substance of which is stated in the opinion, was in the nature of a sale and purchase of the share ; and yet their statute provides, "that the money in the treasury shall be offered for loan in open meeting, and the stockholder, who bids the highest premium for the preference or priority of the loan, shall be entitled to receive it." This is a case directly in point, that though the corporation is expressly authorized to make, what the statute calls a loan, yet the court may look at the whole transaction, and if they regard it in the nature of a sale, they will hold it is not a loan. We will presently see how far this authority is elsewhere sustained.

In the case of *Clarksville Building and Loan Association* v. *Stephens*, 26 N. J. Eq. 355, it was decided, that when an incorporated building association redeems a share of stock, the money is not advanced by way of loan but in redemption of the stockholder's share, and that though it was an incorporated institution, the same principles ought to be applied to it as to an unincorporated institution, when such a transaction ought

to be regarded as a dealing between partners in relation to partnership funds, in which they have a common interest to support, which is the position where the association is unincorporated. He refers to *Delano* v. *Wild*, 6 Allen 1, and other English and Massachusetts cases. He does not refer to the provisions of the New Jersey statute authorizing the incorporation of building associations, probabley because the statute was entirely indefinite on this point; for I find in the act passed February 22, 1849, section 5 Nixon's Digest, 3d edition, p. 84, that "The investment of every such association shall be made either in loans or in the redemption of shares or in purchasing lots." If this was the law in force, under which this decision was rendered, or if the law in force used similar language, this decision gives but little support to the Illinois case; for it would seem, that in the charter of the company a distinction is drawn between making a loan and redeeming a share, but the reverse of this was the case in the Illinois statute.

In Virginia there is no statute especially authorizing the incorporation of building associations by name; but they have been incorporated under a general law to be found in chapter 57, section 59 of the Code of Virginia of 1873, which authorizes the circuit courts or the judges thereof to grant charters with certain specified exceptions "for the conduct of any enterprises of business, which may lawfully be undertaken by an individual or by a body politic or corporate. This and some special acts chartering particular building associations is the only statute-law now in force in Virginia, which in any way affects building associations. But there were formerly laws in Virginia regulating specially the chartering of such companies and their mode of doing business. By the act of March 29, 1852, chapter 101 of Acts of 1852, page 81 it was provided : "That any number of persons not less than nine may associate and become, in the manner hereinafter prescribed, an incorporated company for the purpose of accumulating a fund to enable its respective members to purchase houses and lots, erect buildings, improve lands, and to remove incumbrances from real estate and for the further purpose of distributing among the members, who do not receive aid by advances on their shares, their proper dividends of the fund

so accumulated in money." In section 8 it is provided : "It shall be lawful for such association to redeem the shares held by the stockholders respectively upon such terms and under such regulations, as may be prescribed in the articles ; but such associations shall in no case receive or demand from any stockholder interest exceeding the rate of 6 per cent. upon the sum actually paid by such association to such stockholders for the shares so redeemed and bought in. Nothing herein contained, however shall be construed to prevent the association from receiving and demanding from any stockholder, whose shares have been redeemed, such regular payments on stock, as may be required by the articles, and any fine, that may be imposed on him in accordance with such articles." This act was amended January 31, 1867 ; but this amendment did not change the above provisions.

In the case of *White* v. *The Mechanic's Building Fund Association of Lexington*, 22 Gratt. 233, the building association was incorporated under these acts, which constituted its charter ; and the court held, that the redemption by the association of a share of stock in the usual manner was a purchase by the association of the stock of the member and not a loan. This decision of the Court appears to be right, as the statute expressly calls such redemption a "buying in" of the stock. Judge Anderson says, page 243 : " The statute treats them (redeemed shares) as the property of the association, having been paid for in advance, and therefore as assets." In passing however I would call attention to the fact, that in that case the member, to whom the advance was made, received only $61.90 a share on his stock, while the accumulators received $200.00 (see pages 245 and 246). This shows clearly the tendency to evil results in such corporations.

In the case of *Bibb County Loan Association* v. *Richards*, 21 Ga. 592, the building association had, before it became a corporation, adopted a constitution and by-laws, and then by a special act of the Legislature they were incorporated according to their constitution and by-laws (see pages 611 and 612). They redeemed shares of a stockholder in strict conformity with their constitution and by-laws, as by their charter they were authorized to do. The court held, that the particular transaction was not usurious because of such special charter.

The question is discussed as to what, without reference to this charter, ought to be regarded as the nature of a redemption of shares, whether as a loan or as an advance of funds, in which the stockholder has an interest; and it is obvious, that on this abstract question the court inclined to the opinion, that such transaction would not be regarded as a loan; but they waive the decision of this question. This decision was rendered in 1857, and Judge Lumpkin in delivering the opinion of the court, makes some remarks so applicable to the state of things now existing in this State, that I can not refrain from quoting them (see page 596):

"These building associations number already sixteen in Georgia. That they have improved our towns by leading to a number of new buildings, furnished many families with homes of their own, that could not otherwise have possessed them; given a considerable impulse to mechanical enterprise, and in many other ways promoted the prosperity and welfare of the communities where they exist, is undoubtedly true. But whether they will continue to be entitled to the epithet of the "poor man's exchanges," and whether they will, as they promise to do, enable every man to become his own landlord, will depend entirely upon the manner in which they conduct their business. Under existing regulations I have been led seriously to doubt this. The interest of the *borrower* as well as the *accumulator* will have to be sedulously regarded and protected; otherwise they will forfeit the public confidence and cease to prosper. If all the members were borrowers, and such was the original idea, on which these associations were founded, the plan would work well. But in every such corporation a large number of the stockholders do not join with a view of taking loans, but for the purpose of investing their money where it will yield a profitable return. These are called *accumulators*; while they share in the profits of the association they contribute nothing to produce them; and as a necessary consequence the borrowers have to pay a larger interest to make a given rate of dividends than they would, if they produced these dividends for themselves." In that case the redeeming member received $975.00 and the accumulators owning the same amount of stock $2,000.00; nor was this an extreme case, for the evidence showed, that in two at least of

the Georgia building associations the accumulators on an average received about twice as much as the redeeming members.

In the case of *Robertson* v. *The American Homestead Association*, 10 Md. 411, the Court say : "We adopt the views expressed by the Court of Queen's Bench in *Silver* v. *Barnes*, 6 Bing. N. C. 180, and in the Court of Chancery in England in *Burbidge* v. *Cotton*, 8 Eng. Law & Eq. 57, and *Seagrave* v. *Pope*, 15 Law & Eq. 477." These decisions held, that a redemption of a share by a building association was not a loan but an advance to a member in anticipation of his interest in the association. The statute-law of Maryland governing in such case was an act passed in 1852. We have no access to it; and its substance even is not stated in the case. We cannot therefore tell, whether this case has any bearing on the question before us or not. If the then law of Maryland was substantially what it now is, this case would be entitled in my judgment to no weight in determining, whether a redemption of stock in a building association in this State is or is not a loan, as the Maryland law now calls such redemption "an advance to the member for such premium, as may be agreed upon, of the sum which he would be entitled to receive upon the dissolution of the corporation." See Rev. Code of Md. 1878, Art. XL, § 9, p. 329.

We will now review the cases, in which it has been decided, that the redemption by a building association is a loan of money and therefore subject to the usury-law, except so far only, as by its charter or the law, under which it was incorporated, it was exempted from the operation of the usury-laws of the State.

In Pennsylvania by an act passed April 22, 1850, the court of common pleas was authorized to grant charters to saving fund and building associations; but the act did not define, what they were, or what modes of doing business should be adopted by them. In *Kupfert* v. *Guttenberg Building Association*, 30 Pa. St. 465, the court held, that a redemption of a share of stock by a building association incorporated under this act was a loan of money to the stockholder, and that it was subject to the provisions of the usury-law. The court indulged in, what I think I may properly call, bitter abuse of these asso-

ciations, (see p. 468.)   After this the Legislature on May 8, 1855, passed a law which said: "In investments by building associations in loans to members the premium paid shall not be deemed usurious." The court again declared the redemption of a share a loan and interpreted this law as only saving the building associations from the penalties of the law against usury as far as provided by this act, but did not render valid such contract if usurious.   In this case the amount loaned was only about one third of the principal sum the building association claimed; the transaction was strongly reprobated by the court.

In 1859 the Pennsylvania Legislature passed an act providing for the incorporation of building associations and regulating them in detail.   See Brightly's Purdons' Digest, 3d ed. p. 183.   The fourth section of this act provides: "that the money of the building association shall be offered for loan in open meeting and the stockholder who shall bid the highest premium for the preference or priority of loan shall be entitled to same."   The sixth section provides: "no premiums, fines, or *interest on such premiums* according to the provisions of this act shall be deemed usurious, and the same may be collected as debts of like amount are now collected by law."

Under this act the court in *Wolbach* v. *The Lehigh Building Association*, 84 Pa. St. 211, held still, that the redemption of a share was a loan by the building association, and when the share was held by a married woman though used in erecting a building on her separate estate, as she had no power to become a member of the association, the association had no authority to make such loan to her, and this sixth section therefore did not authorize the collection of the premium, and all that could be enforced was the money actually received and legal interest thereon.

The 8th section of this act declared, that it was the purpose of the act of 1850 to declare, that the taking of premiums of the redemption of shares by building associations should not be usurious.   The courts had previously construed the taking of such premiums to be usurious.   But the Court in *Reiser* v. *The William Tell Saving Fund Association*, held this act, so far as it undertook to construe the previous act, unconstitutional, and that on contracts made by building associ-

ations in the redemption of stock prior to the passage of the act of 1859 the transaction was a loan, and the taking of the premium was usury.

In the case of *Melville* v. *American Benefit Building Association*, 33 Barb. 103, the building association was unincorporated, and it was held, that the redemption of a member's share was a loan, and the taking of the premium for the preference was usury. This decision and a similar one in 68 Pa. St. 67, *Janett's ex'r* v. *Coke*, cannot be reconciled with *Silver* v. *Barnes*, 6 Bing. N. C. 180 and the cases, which have followed that decision.

In *Mills et als.* v. *Salisbury Building Association*, 75 N. C. 292 it was held, that the redemption of a share of stock by a building association was a loan, and the taking of the premium was usury. The company was incorporated, but the act, under which it was incorporated, did not, as is usual in such acts, declare, that the taking of such premium should not be held usurious.

In *Herbert* v. *Kenton Building & Saving Association of Covington*, the building association was incorporated under an act, which authorizes it "to assess and collect contributions, dues, fees, &c., from its members and to afford to its members a safe depository for their weekly earnings and to loan its accumulated funds and weekly deposits to its members or others; to afford relief to its members by advancements or otherwise in building and securing houses and homes, and to this end may exercise all such powers, as may be necessary, not contrary to the Constitution of Kentucky. It was decided, that under this act the redemption of a share in the usual way was a loaning of money, and the taking of the premium made the transaction usurious. It will be observed, that the usual provision, that the taking of such premium should not make the transaction usurious, was not in the act.

In the case of *C. E. H. Martin* v. *The Nashville Building Association and others*, 2 Cold. 418, it appears that on February 4, 1854, the Legislature of Tennessee passed an act, the object and purpose of which, as expressed in the act, was to form a mutual benefit and stock company, to enable the working men of Nashville to become their own landlords; and all the powers and incidents of a corporation were conferred

on the Nashville Building Association to be formed under this
act.   So far as the case shows, there were no special modes,
whereby this building association was to effect its pur-
poses, ever provided, but the members of the association were
authorized to adopt such constitution, as they thought proper,
which should have the force and effect of legal enactments on
its members, provided it was not in conflict with the law of
the land ; and it was expressly provided, that the funds of the
corporation should be loaned out to its stockholders in such
manner, as the constitution should provide ; and on its termi-
nation each stockholder was to receive $200.00 out of its
funds.   They adopted a constitution having in it the usual
provisions of building association constitutions.   It was de-
cided, that a redemption of a share in accordance with the
constitution, the association retaining the premium bid, was
a loan of money, and the retention of the premium made it
usurious.   There was no provision in the act exempting the
association in any case from the usury law.

In *The Mutual Savings Bank and Building Association* v.
*Wilcox et als.,* 24 Conn. 147, the act, under which the asso-
ciation was chartered, authorized the association to loan
money to its members on real or personal security, and to re-
ceive for such loans, in addition to the legal rate of interest,
such *bonus* as the parties in each case might agree upon ; and
if no member needed the money, it might be lent to others
at legal interest.   In its first constitution the association pro-
vided for redeeming shares in the usual way by a bid among
the members for a preference in taking the loan ; but after-
wards they changed it and declared, that the "rate of bonus
should not exceed three fourths of one per cent. a month."
It was the former, that Wilcox agreed to pay for this prefer-
ence in redeeming his stock.   It was insisted, that this pay-
ment of three fourths of one per cent. a month was not a
bonus within the meaning of the law, that the transaction
was a loan and a loan at usurious rates ; and the court so
held.   It was further claimed, that as Wilcox had become a
member of the association merely to make this illegal con-
tract, and the association had no authority to make such a
contract, that the contract ought to be regarded as absolutely
null, and no part of the amount loaned ought to be permitted

to be recovered ; but the court held otherwise and required the amount loaned with legal interest to be paid.

In Ohio there was passed on February 21, 1867, this act :

"Section 1. Any number of persons not less than five may associate themselves together and become a corporation as provided by the sixty-third, sixty-fourth and sixty-fifth sections of an act entitled 'An act to provide for the creation of incorporated companies in the State of Ohio,' passed May 1, 1852, for the purpose of raising money, to be loaned among the members of such corporation for use in buying lots or houses, or in building or repairing houses, and such corporation shall be authorized and empowered to levy, assess and collect from its members such sums of money by rates of stated dues, fines, interest on loans advanced and premiums bid by members for the right of precedence in taking loans, as the corporation by its laws shall adopt ; also to acquire, hold, encumber and convey all such real estate and personal property, as may be legitimately pledged to it in such loan, or may otherwise be transferred to it in due course of its business ; *provided,* that the dues, fines and premiums so paid by members of such corporation, although paid in addition to the legal rate of interest on loans taken by them, shall not be construed to make the loans so taken usurious ; *and provided also,* that no person shall hold more than ten shares in any such corporation in his own right.

"Sec. 2. Any stockholder of any such association shall be deemed and held liable to an amount equal to their stock subscribed by them or held by them at any time in addition to said stock, for the purpose of securing the creditors of said association." (See Ohio Statutes, vol. 64, p. 18.)

This Ohio statute seems to have been taken almost verbatim from a law passed by the Legislature of West Virginia only seventeen days before. It is identical in substance and almost in words with the 1st, 2d and 3d sections of the act passed by the Legislature of West Virginia on February 4, 1867, except that the Ohio Legislature added the proviso, that no one person should hold more than ten shares of stock and omitted some sections of our act. See Session Acts of 1867, ch. 5, p. 5. Those sections of our act, which compared with the Ohio statute were re-enacted in the same words in the

Code of West Virginia, chapter 54, sections 25, 26, 27 and 28, page 411, and have been copied in this opinion. This Ohio statute has since been repealed. The language of the Ohio statute and the West Virginia statute are so nearly identical and were passed so nearly at the same time, that the inference is, that they were the result of a conference or some communication between some members of the Legislatures of the two States, both then in session. This Ohio statute has been construed by the Supreme Court of Ohio; and its construction is entitled to much consideration by our courts, because of the close resemblance of the two statutes.

In the case of *The Forest City United Land & Building Association* v. *Gallagher et als.*, 25 Ohio St. 208, the building association was incorporated under this act of 1867; and the court decided, that the redemption of a share of stock was a loan by the association, and the agreement to take interest on the premium bid under this act for a preference in taking the loan made this loan usurious. In Ohio *ex rel. Attorney General* v. *Greenville Building, &c. Association* 29 Ohio 92, the building association was incorporated under an act, the language of which was: "Such corporation shall be authorized and empowered to levy, assess and collect from its members such sums of money by rates of stated dues, fines, interest or loans advance and premiums bid by members or depositors for the right of precedence in taking loans, as the corporation by its by-laws shall adopt." This language, it will be noticed, is the same, as that used in our statute, except only that *depositors* as well as members are authorized to take loans and become bidders therefor. It was held, that the redemption of a share of stock was a loan; and that the premium to be given therefor could not be fixed by the building association but could only be determined by the public bidding, and the association was bound to lend its moneys to the member or depositor, who bid the highest premium and to lend it at legal interest.

From this review of the authorities the conclusions, which I reach, are, that when the building association is unincorporated and therefore a partnership, the weight of authority is perhaps in favor of holding, that a share redeemed by the as-

sociation should be regarded not as a loan but as an advancement made out of the partnership assets, though the courts, which hold this, would doubtless hold, that if it should be found, that this mode of doing its business was in truth and fact a mere cover to effect loans at illegal interest, such a redemption of shares by such unincorporated building association, would be regarded as a loan. See *Shannon* v. *Dunn,* 43 N. H. 198. But there is, as we have seen, highly respectable authority, which holds, that the redemption of a share by an unincorporated building association should of itself be regarded as a loan and not as a purchase of the interest of the member or as advancement to him out of the partnership funds; and, it seems to me, this view is sustained by the weight of reason. That this redemption in the usual way of a share in an unincorporated building association could not be regarded as a purchase by the other partners of the interest of the redeemed member in the partnership would seem clear, because he admittedly remained a partner and had a voice as a partner in the management of the concerns of the partnership. Nor, it seems to me, can it with propriety be regarded as an advance to him as a partner out of the partnership funds of a part-or the whole of his profits or anticipated profits. If this were the transaction, there would be no requirement of him to pay interest on what was advanced to him, as it assumed, that this advance is only a payment on his profits in the partnership. The payment of interest seems to me to give to this transaction the character of a loan.

It may be said however, that, as he is not required to pay back the money, it cannot be regarded as a loan. But is he not required to pay it back? The interest is by the arrangement to be paid at short intervals, and the principal, as I understand, at the dissolution of the partnership. By the terms of the co-partnership it is not to be dissolved, till a certain sum has been accumulated so as to make the dividend of this partner a specific sum. So the co-partnership knows, that at the time, when it is agreed, that it shall be dissolved, the co-partnership will owe this member a specified sum; and by this redemption of his share, as it is called, this interest on the money, which he receives, is to be kept paid up, and the principal to be paid out of what may be coming to this re-

deemed partner at the dissolution of the partnership. The remainder, that would be coming to him, being retained by the other partners for the accomodation, which the co-partnership had afforded this partner by the loan. This agreement, that the other partners should retain this premium for this loan, would of course make the transaction usurious. This question being presented to the English courts at a time, when this redeemed partner by his plea of usury could avoid the payment of the principal as well as interest of this loan to him, they naturally sought some mode of defeating such injustice; and this they did by denying, that this transaction was a loan. They were probably the more disposed to put some construction on the transaction, which would prevent the application of the usury-laws to it, because the case was far different in its moral aspects from most cases, where the courts are called upon to apply the usury-statutes. They were generally cases of oppression on the part of the lender. But not so in this case, for at that time all the members of such building association partnership were poor men, and in their turns all of them in like manner borrowed money of the co-partnership to build them dwelling-houses, and all paid like premiums therefor; and as the premiums went to the co-partnership, it was in effect returned to those, who bid the premiums. Under such circumstances it was grossly immoral for one partner to take advantage of his co-partners by pleading the usury-law as a bar to the payment of the money, which he had borrowed; and hence, I conceive, the English courts to defeat this wrong very naturally inclined to regard, if possible, the transaction as no loan.

It seems to me however that the natural and proper construction to place on such a transaction is to regard it as a loan by the co-partnership to one of the partners. We need not however determine this point of controversy, as it does not arise in this case. If however the building association be an incorporated company, and there be nothing in its charter which authorizes it to advance money to its stockholders out of their future profits or to purchase their shares still requiring them to pay their dues, then both by the decided weight of authority as well as of reason a redemption of a share by the building association in the usual manner must be regarded

as a loan to the redeemed member.  If the charter, as it always did, permitted the building association to redeem the shares of its members, if it did so in the manner authorized by its charter or by law, though the transaction was construed according to its most natural construction as a loan, it would not subject the building association to the penalties inflicted on usury, for they would in such case only be doing what they were authorized by their charter or by statute to do.  There being no longer this pressure which bore on the English courts, when these building associations were incorporated, there has been a very general concurrence of the courts in holding, that when the building association is a corporation, a redemption of shares in the usual manner authorized by law is a loan, except when the charter of the company or the law has used such language, as indicates, that the Legislature in chartering the company authorized it to advance money to a stockholder and showed, that they regarded a redemption of stock as not a loan but as either a purchase of the stockholder's share or such advance to him.

In addition to the reasons, which we have assigned for so holding, there is this reason, that under the strict construction which the courts apply to the charters of all corporations in construing the powers given to them, which are the only powers they can exercise, it may be regarded as at least doubtful, whether they can purchase their own stock as a general rule, unless it is done *bona fide* to secure a doubtful debt to them previously contracted.  See *In re Lowden, &c., Exchange Bank*, Law R., ch. 5 App. 444; *Johnson* v. *Bush*, 3 Barb. Chy. 207. If so, it may be regarded as doubtful, whether they would have any power in the absence of an express or fairly implied power so to do in their charter or in the law, under which they are incorporated, to advance to a stockholder out of their assets the whole or any portion of the value of his stock as an advancement out of common funds.  While the power to lend to its stockholders seems necessarily implied in the very objects, for which building associations are incorporated, that is, to aid their members to build dwelling houses for themselves, and still more clearly from the declaration of almost all charters and laws on the subject, that the taking of dues, premiums, &c., shall not be regarded as usurious, and as there

can be no usury, unless there be a loan, this seems clearly to imply their power to loan to their members.

But if in addition to an absence in the statute-law or charter of a building association of any expressions that would go to show, that it was intended to confer authority on the corporation to purchase shares of stock or to make advances on them otherwise than as a loan, there are in such statute-law or charter expressions, which clearly indicate, that the Legislature regarded a redemption of a share by the corporation as a loan to the member, whose share is so redeemed, it would seem clear beyond any reasonable doubt, that the courts must regard such redemption as a loan. Our statute is clearly of this character. The 27th section of chapter 54 of Code of West Virginia, page 411, says : "Every such association is authorized to levy, assess and collect from its members such sums of money by stated dues, fines, ¦*interest on loans* advanced, and premiums bid by members for precedence in taking *loans*, as the corporation by its laws shall provide; *provided*, the dues, fines and premiums paid by the members of such corporation, although paid in addition to the legal rate of interest *on loans* taken by them, shall not be construed to make the *loans so taken usurious.*" This language shows clearly, that our Legislature regarded the redemption of shares by a building association as *loans*, and only authorized the association to *loan* money to its members by such redemption. Our court could not in view of the wording of this statute hold such redemption to be anything else than a *loan.* The courts of Ohio have not hesitated to put this construction on this identical law; nor can we hesitate to so construe this statute.

It is unnecessary in this case to define particularly the extent of the exemption of *these loans* by this act from the operation of the statute against usury. It will be sufficient to decide, whether this exemption from the application of the usury-laws applies to a case, where by redeeming a share of stock of a member of the association it *lends* him money, and he agrees to pay a premium therefor, but does not use the money so obtained, in the language of our statute (sec. 25, ch. 54 of Code of W. Va. p. 411) "in buying lots or houses, or in building or repairing houses." That the use of the money so loaned for any other purpose than those named was

obviously regarded by our Legislature as a most mischievous and culpable perversion of the law and the whole object of the Legislature in permitting the incorporation of building associations and more especially of the special privileges conferred of lending money in a particular way and for a particular purpose at usurious rates. This is clearly shown by the very next section (sec. 26 of Code of W. Va., ch. 54, p. 411) which provides: "Such corporation shall not use or *direct the funds thereof for or to any other object or purpose* than those mentioned in the preceding section, and in case the said funds shall be so used or directed, the association so using or directing them shall forfeit all its rights and privileges as a corporation.

It is argued, that as the 27th section of chapter 54 of the Code of West Virginia gave the corporation implied authority to loan money to its members by a redemption of their shares, it must follow, that when so loaned they cannot longer control it; and that while it is the duty of a member not to seek such loan, unless he intends in good faith to use the money "in buying lots or houses or in building or repairing houses," yet if acting in bad faith he does so, the corporation ought not to suffer by his bad faith, and especially he ought not thereby to profit. It may be true, that where the corporation proves affirmatively, that it used all proper care and diligence, as by this statute it is bound to do, to prevent its funds being "used for any other object or purpose than above mentioned," but that nevertheless from the active devices of the redeeming member it was despite its diligence misled to loan the money under a well founded belief based on substantial grounds, that the money was to be used only for the legimate objects above specified, the borrower might be in a court of equity held to be estopped to deny, that the money was borrowed for these legitimate objects. But on this point it is unnecessary to express an opinion, whether, if the corporation shuts its eyes and uses no diligence to prevent its funds being used for other than legitimate purposes, it is blameworthy and has clearly violated its duty, and forfeits its peculiar right and privilege of being allowed to contract for an extra premium, when it makes a loan at legal interest. No other corporation or individual is permitted to receive this extra premium on

making such a loan. The building association corporation is permitted to do so, only because the money, which it loans, is to be applied to building or aiding in acquiring homes for its members. This the law regards as so praiseworthy a use of their money, that because of their so using it, or so directing their funds to this use it confers on these associations this extraordinary privilege. If they have either purposely or carelessly permitted their funds in violation of the whole object of their incorporation to be misused, they have fairly forfeited this special privilege. Have they any authority to take this extra premium for the loan of money, except where it has been lent to be used for the acquisition of homes for its members? And can they be said to have loaned it for any such purpose, if they have not been diligent to see, that it was applied to such purpose?

But it may be asked : How can they see to the application of the money they have loaned? I answer, with much more facility than purchasers from trustees can see to the application by the trustee of the money paid to him by the purchaser, as in many cases such purchasers are bound to do. The building association frequently lends money on a vacant lot as security, which is not of sufficient value to render the security good, but on which the purchaser is expected out of the funds lent to build a house. When the house is built, the security taken by the association on the lot is ample ; but if the house is not built, the association is in danger of losing its loan. In such cases they never find difficulty, or at least insurmountable difficulty, in seeing, that the money loaned is properly applied in building a house. One very usual mode of seeing to the proper application of this money loaned is to pay it to the borrowing member only from time to time as the building of the house progresses ; and no part of it is paid till the lot is procured and the house commenced. If they would use the same diligence, when they were well secured, in seeing that the money loaned by them was used only for legitimate purposes, it would be very rare indeed, that any of their funds would be used for any other object or purpose than those specified as legitimate objects of its use in their charter.

What does our statute mean when it says: "Such corpor-

ations shall not direct the funds thereof to any other object than the legitimate objects specified?" Is it not obvious, that the Legislature contemplated their retaining, if necessary, a direction of the funds, after the loan was made? Are they not by this made responsible for the borrower's use of it for legitimate purposes? Is it any harder to require this of the corporation than to require a purchaser from a trustee in many cases to see, that the trustee applies the purchase-money to its legitimate purposes? When we remember, that if the funds of a building association are not used for these legitimate purposes, all the benefit to the public of building associations are lost, and they become ,nothing but legal ized usurers, can it be doubted, that our Legislature designed to impose on them the duty of seeing, that the money, which they loaned, was applied only to the legitimate purposes named in this act? There are many cases, where parties are held even criminally responsible, though they did not positively design to violate any law or do any wrong. Thus if in this State a person sell intoxicating liquor to a minor, though he may verily believe him to have been twenty-one years of age, yet he is punishable. Nay he would in such case be punishable, though he used the utmost care and diligence in ascertaining the age of the parties, to whom he sold the liquor, and was misled and deceived as to his age. See *State of West Virginia* v. *John Cain,* 9 W. Va. 559; also *State* v. *Hartfiel* 24 Wis. 60. So if he sell intoxicating liquor believing verily, that it was not intoxicating, he can be held criminally liable. 2 Allen 160. And so in Massachusetts, if he sell adulterated milk, he is guilty of a criminal offence, though he did not know the milk to be adulterated. And so a person there is punishable for killing a calf under four weeks old; and his ignorance of the age of the calf is no defence. *Com.* v. *Raymond,* 97 Mass. 567. The same sort of decisions are found everywhere; many of them are referred to in *State* v. *Cain,* 9 W. Va. 573.

The general rule seems to be, that where a statute commands an act to be done or omitted, which in the absence of statute-law might have been done or omitted without culpability, ignorance of fact or of the state of things contemplated by the statute will not excuse its violation. See *Barnes* v. *The State,*

19 Conn. 398; *Com.* v. *Mash,* 7 Metc. 472; *Com.* v. *Boynton,* 2 Allen 160. There is therefore no special or peculiar hardship in holding a building association responsible, if its funds loaned are used for illegitimate purposes.

But it may be said, that intent is of the very essence of usury; and it is certainly true, that all the authorities do hold, that if the lender does not intend to take more on a loan than legal interest, the transaction cannot be held to be usurious. See *Childers* v. *Deane,* 4 Rand. 406; *Bush* v. *Buckingham,* 2 Vent. 83; *Gibson* v. *Stearns,* 3 N. H. 185, 187; *Nevison* v. *Whitley,* Cro. Car. 501; *Levy* v. *Gadsby,* 3 Cranch 180; *Heath* v. *Cook,* 7 Allen 59, 60; *N. Y. Fireman's Insurance Co.* v. *Sturges,* 2 Cow. 664, 667; *Marvine* v. *Hymers,* 12 N. Y. 223, 231, 236. Some of the decisions have gone even further and hold, that a transaction cannot be held to be usurious, unless the borrower intended to pay more than the legal rate of interest, even though the lender did intend to take more, and that there can be no usury, where either of the parties is ignorant, that more than legal interest has been received. See *Condit* v. *Baldwin,* 21 N. Y. 219; *Aldrich* v. *Reynolds,* 1 Barb. Ch. 43, 44; *Haywood* v. *Le Baron,* 4 Fla. 404. But on the other hand the authorities all show, that if more than the legal rate of interest was intended by the parties to be received and was in point of fact received, the transaction will be held to be usurious, though neither of the parties intended to violate the statutes against usury. See *Maine Bank* v. *Butts,* 9 Mass. 55; *Childers* v. *Deane,* 4 Rand. 406; *Levy* v. *Gadsby,* 3 Cranch 180.

There can be no question, that where a member of a building association redeems shares and thus borrows money and bids a premium for the loan at the legal rate of interest, in thus giving or agreeing to give such premium he agrees to give a greater rate of interest, than the law permits to be taken on the loan of money, and the transaction is usurious, as both parties intended to reserve more than the legal rate of interest, unless it can be shown, that the statute-law authorized the building association in the particular transaction to take such premium in addition to the legal rate of interest. The intent of the parties to take and give respectively more

than the legal rate of interest is in such case clear. The transaction is, as we have seen, a loan of money; and it is entirely immaterial, whether the parties regarded the transaction as a loan or not, or whether they intentionally violated the usury-laws, provided they intended that more than the legal rate of interest should be reserved, as in such case it clearly would be, and provided the statute-law did not in the particular case authorize more than the legal rate of interest to be taken.

Now, we have seen, the statute-law only authorizes more than the legal rate of interest in such case to be taken, where the money borrowed is used for buying lots or houses or in building or repairing houses; and if used for any other purpose, the transaction is on the same footing as any other loan, and the parties intending, that more than legal rates of interest should be reserved, the transaction is usurious. I have found no authorities directly on this question, except a single case in Ohio. When the Ohio Legislature copied our homestead and building association act of 1867, they omitted the section above quoted, which declared, that " such corporation shall not use or direct the funds thereof for any other objects than those specified " under the penalty of a forfeiture of all its rights and privileges. This omission showed clearly, that the Ohio Legislature did not consider, that it was so important, that the funds should only be applied to the legitimate purposes, as did the Legislature of this State. But this was still more clearly shown next the year. On May 9, 1868, see Ohio Laws, ch. 5, page 173, the law was changed so as to read, in stating the purpose of such building associations: "For the purpose of raising moneys to be loaned among the members and depositors of such corporation for use in buying lots or houses or in building or repairing houses or *other purposes.*" These words *or other purposes* added to the objects, for which the money was loaned, clearly shows, that the Ohio Legislature intended, that thereafter the money loaned might be used for any legitimate purposes, no matter how foreign its use might be to the original object of building associations. Basing the decision expressly on the words added in 1868 to the Ohio statute-law, their court in *Hagerman et al.* v. *Ohio Building and Savings Association*

*et al.,* 25 Ohio 201, decided, that these associations are not bound to supervise the application of the loans made by them. The court says, page 201 :

" The statute (above quoted sec. 1 of Acts of May 9, 1868) contemplates the loan of money by such association among its members and depositors to be used in 'buying lots or houses or in building or repairing houses *or other purposes.*' The borrower may use the money for the payment of debts generally or in his general business or for any other lawful purpose. There is no duty imposed upon building associations to enquire as to the intended use of the loan."

This was obviously the effect intended to be produced by the addition of these words *or other purposes* not found in our act ; and it would have been difficult if not impossible for the court to give them any other construction, though this was to destroy the distinctive characteristic of a building association. In *Ohio ex rel. Attorney General* v. *Building &c. Association,* 29 Ohio 97. The Court seems to think, that all the distinctive characteristics of a building association are not thereby obliterated "by the latent powers that may repose in this phrase ' *or other purposes,*' with which the enumeration closes." We conclude, that under our statute it is the duty of a building association, when by redeeming shares for a member it loans him money, to see, that this money loaned is applied " to buying lots or houses or in building or repairing houses."

What then is the consequence of the neglect of this duty and of permitting the money loaned to be applied "to any other object or purpose ? It is insisted by the counsel of the appellant, that it renders null the whole transaction. This position is untenable. In the case of the *Mutual Savings Bank & Building Association* v. *Wilcox et als.,* 24 Conn. 137, the building association for a loan of money to a member took a bonus, which under the law it had no right to take, and which in the judgment of the court rendered the contract usurious ; but as the building association had authority to make a loan to one of its members, though in making the loan it did so on terms not within its authority as violating the usury-law, yet the court held, this only put the association in the same situation, as a bank would be or any natural person, who violated the usury-law, and did not render null the whole con-

tract. It has always been held, that if a bank makes a usurious contract, the contract must be considered in the same manner, as if made by a natural person. See *Bank of United States* v. *Owens et als.*, 2 Pet. 527, and also *Philadelphia Loan Co.* v. *Towner*, 13 Conn. 249. While then this contract made by the redemption of shares of a stockholder, who was not required to invest the money loaned in lots or houses or building or repairing houses, is not void, yet as the building association has authority to take a premium for such loan, only because the loan is to be so invested, if it be not so invested, the association has no right to take such premium and must in this respect stand just as a natural person or bank would stand, who contracted to take a premium beyond the legal rate of interest; such loan would be usurious, and under our usury-law the lender could only recover on it the money actually loaned with the legal interest thereon, and would forfeit the usurious interest, in such case the premium.

As to the question, whether it is or is not a breach of good morals for the redeemed member or borrower to take advantage of his own wrong in such case, it is as applicable to any other case of usury. It would unquestionably be immoral in many cases for the borrower to take advantage of the usury law, and accordingly the courts never apply the law, unless asked to do so by the borrower; but if asked to do so, acknowledging it as his legal right the court gives him the benefit of the usury-law, leaving it to him to determine for himself, whether it be moral or immoral in the particular case.

It remains but to apply the principles of law, as we have laid them down, to the facts of this case. Franciska Conrad was a member of the Wheeling Building Association, a corporation chartered under chapter 54 of the Code of West Virginia. As such she redeemed her four shares of stock, the par value of which was $150.00 a share, immediately on becoming a member of the association. This redemption was made on April 10, 1868, she being the highest bidder for the preference for the loan then offered to be made by the association. Her bid was thirty-one per cent. on the value of her stock. This was deducted from the par value of the stock, $600.00; and the balance, $414.00, was paid her in cash. She gave her note for $600.00, with interest from date, paya-

ble monthly in advance, the principal being payable eight years after date, when it was supposed the association would probably close. By its constitution it was to close when there were funds on hand to pay each unredeemed shareholder $150.00 on each share. Her brother, John Pfeister, gave a deed of trust on forty-nine acres and also on another tract of one hundred and thirty-three acres of land in Brooke county to secure this note. The association, when this money was loaned to her made no enquiry, as to how it was to be expended, and used no diligence in seeing to the application of it by her in buying a lot or house or in building or repairing a house. She spent no portion of the money for any of these purposes.

The association closed August 24, 1874. She then owed to it dues of twenty-five cents on each of her four shares for two hundred and sixty-five weeks or $265.00, and fines for all this time at ten cents per share, amounting to $105.20. The association claimed, that she also owed sixty-three and one third month's interest on her $600.00 note, amounting to $190.00 and fines for the non-payment of this interest each month promptly at ten cents for each share redeemed, amounting to $24.40, in all $584.60, as claimed by the association. On April 9, 1875, the trustee advertised this forty-nine acres of land and the tract of one hundred and thirty three acres, or so much thereof as was necessary, for sale to pay the amount secured by the deed of trust, which the association claimed was this $584.60 with interest from August 24, 1874. Pfeister, the grantor in this deed, got an injunction on the grounds alleged in his bill, the substance of which has been given in the statement of this case. The court by its decree of March 14, 1877, ascertained, that the balance due from her, so far as the same was secured by this deed of trust securing her $600.00 note, was $455.00 with interest from August 24, 1874. This was the amount claimed by the association excluding the $105.20 fines for non-payment of dues and $24.40 fines for non-payment of interest, which fines the court considered were not secured by the deed of trust.

Many objections are urged to the determination of the court, that this sum of $455.00 with interest from August 29, 1874, was secured by this deed of trust. One objection

is, that the deed of trust after describing the note secured correctly stated, as though it were a part of the note, that it was payable according to the rules and regulations of the association, when the note on its face was an ordinary note with no such provision in it. The proof was clear, that this was the only note she ever executed and was the one intended to be secured. This is all that can be possibly necessary in a controversy, as this is, between the parties to the deed of trust, no third person being concerned. We cannot apply the rules of pleading to a misdescription of the note secured by a deed of trust. If the amount or date of the note had been inserted wrong by mistake in the deed, it would not have rendered it void, as counsel seem to suppose, though it would have been a fatal error in a declaration on the note. No authority is cited to sustain this view of counsel, and none can be found for it is obviously unsound.

The second objection is, that the deed of trust to secure this note cannot be enforced, because the money loaned was not used to purchase a lot or house or to build or repair a house, but for entirely different purposes. This, as we have seen, does not render the note void, but prevents the enforcement by the association of any more of it than the actual amount loaned, $414.00 and legal interest thereon, calculated at simple interest. The association for this reason having no right to enforce the premium, which she agreed to give for this loan, $186.00, included in this note.

It is also claimed, that it was the duty of the association to notify Pfeister of the defaults of Franciska Conrad, the maker of this note. There is proof of such notification; but it was unnecessary. I know of no reason, why the party, who secured the payment of this note by a deed of trust, can claim to throw on others the obligation of watching his interest and seeing, that he was not injured by the default of his sister in meeting her obligations.

It is insisted, that the association had no right to take this security for this note from a party not a member of the association. The association is expressly authorized by section 27 of chapter 54 "to acquire such property as is legitimately pledged to it in the due course of business." This was the exact mode, in which this property was pledged ; and there is nothing in this objection.

Having disposed of these various minor objections, which strike me as without force, we will now consider, what was really the amount secured by this deed of trust. For reasons, which we have stated at length, the association could recover on this note only the sum actually lent and simple interest at 6 per cent. per annum, that is, $414.00 with interest from April 10, 1868. It must however be credited by any interest, which she has paid, and by any balance, which was due to the maker of the note as a member of the association, when it closed, August 24, 1874. It is therefore necessary to determine on what principles the association should have then settled with her for reasons, which are stated at length in the cases of *James McGannon* v. *The Central Building Association No. 2, & Cowden, trustee; John E. Parker et als.* v. *United States Building, Land & Loan Association et als.*, and *John E. Parker* v. *Same*, decided by this Court at the same time this case is decided. She in such settlement should be charged with the amount of dues, which she had been charged with and had failed to pay ($265.00) and with fines against her for her failure to pay these dues ($105.20) in all $370.20. But she was not chargeable with the $24.40 of fines imposed on her for non-payment promptly each month of the interest on her note of $600.00. For, as will appear in the case of *John E. Parker* v. *The United States Land & Loan Association et als.*, decided at the same time with this, a building association has no authority to charge a member, who has redeemed his stock with fines for the non-payment of interest. She was entitled at that time, August 24, 1874, when the association closed, by the 17th article of the Constitution to $150.00 on each share or $600.00. Deducting from it the $370.00 she owed as a member of the association, there was on August 24, 1874, due her as such member $229.80. The evidence shows, that she had paid of interest on her loan $33.00, making her credits in all $262.80. There was then due from her on the loan secured by the note and deed of trust $414.00, with interest from April 10, 1868, the date of the loan, to August 24, 1874, amounting to $158.35 in all $572.35. Deducting from this her credits, then amounting to $262.80, there would be left the true balance secured by the deed of trust, $303.55, instead of $455.00 as adjudged by the circuit

court. The decree of the circuit court therefore ascertaining this amount due on this deed of trust must be reversed.

The fines imposed on her by the Association for the non-payment of her dues can be legally enforced according to the decision of this Court in the case of *James McGannon v. The Central Building Association No. 2 & J. W. Cowden, trustee,* if they were reasonable, for the reasons therein stated, which need not be here repeated. The fines were reasonable. They were ten cents in advance on each share, which, as the dues were only twenty-five cents a week, at first sight seems to be a heavy fine, being forty per cent on the amount of the dues to be paid on which default is made. But when we consider, that no interest was charged on these dues, and the large profits, to which she was entitled as a member of the association, it will appear, that these fines were reasonable. She paid in to the association as the evidence shows, only $94.00 as a member excluding the $33.00 of interest paid and including the $11.00 of expenses in connection with the giving of the deed of trust, and yet at its close she was after paying all her fines entitled to receive $229.80, as the money she paid out, $94.00, had been paid out at the close of the association on an average of only about five years and ten months, the interest she received as such member was about forty per cent per annum. Had she paid up her dues regularly so as to have been subjected to no fines she would have paid in to the association $348.00 and received from it $600.00 or made a profit of $252.00; and her $348.00 would have been paid out on an average of about three years and eight months or about thirty-three per cent per annum. It thus appears that she made after paying her fines a somewhat larger per cent as a member of the association on the money she invested than the accumulators in this association. They made about thirty-three per cent per annum, while she made forty per cent per annum. This demonstrates that in this operation the fine of ten cents per week for the non-payment of dues was scarce enough to make it the interest of members to pay their dues promptly. This it seems to me must however be an exceptional case. The profits of building associations generally cannot be to the accumulators as much as thirty-three per cent per annum. If they are, these institutions

must practically work great injustice to the mass of the redeeming members unless the number of accumulators is small. The redeeming members would have to pay in such case, if one half of its members were accumulators, on average thirty-three per cent per annum including their fines for money borrowed.

For the reasons we have stated the decree of the circuit court of Brooke county of March 14, 1877, must be set aside, reversed and annulled ; and the appellant must recover of the appellee, The Wheeling Building Association, its costs in this Court expended ; and this Court proceeding to render such decree, as the circuit court of Brooke county should have rendered, must find, that there is due upon the note secured by the deed of trust executed by John Pfeister to J. L. Stroehlein, trustee in the bill and proceedings mentioned, $303.55 with interest thereon at the rate of six per cent. per annum from August 24, 1874 ; and unless the same be paid within sixty days from this time, that R. G. Barr, who is hereby appointed a special commissioner for that purpose, do sell the forty-nine acres of land mentioned in said deed of trust, or so much thereof, as may be necessary, said sale to be made on the terms, in the manner and after the advertisement named in the said decree of March 14, 1877, and upon his executing the bond prescribed in said decree ; and this cause is remanded to the circuit court of Brooke county to be proceeded with according to the principles governing courts of equity.

JUDGES JOHNSON AND HAYMOND CONCURRED.

DECREE REVERSED.    CAUSE REMANDED.

---

# WHEELING.

